IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

WILMER YARLEQUE ORDINOLA,       )
                                )
        Petitioner,             )
v.                              )      CIVIL ACTION NO. 05-847
                                )
JOHN F. CLARK,                  )
                                )
                                )
        Respondent.             )

## MEMORANDUM OPINION

THIS MATTER is before the Court on Wilmer Yarleque Ordinola's Petition for Writ of Habeas Corpus. This case concerns the Republic of Peru's request for extradition of Mr. Ordinola, a former member of "The Colina Group," a special government military unit formed to fight terrorism. Ordinola claims that his actions against "The Shining Path," a violent terrorist group that was attempting to disrupt Peru were actions directed by government, and his actions fall within the political offense exception from extradition. Peru contends that Ordinola's actions were not political offenses, but violent crimes including aggravated homicide, aggravated kidnapping, forced disappearance of persons, inflicting major intentional injuries, and delinquent association. On June 10, 2005, Magistrate Judge Liam O'Grady issued a Certification of Extraditability subjecting Mr. Ordinola to extradition to Peru. Mr. Ordinola filed this habeas petition seeking review of the Magistrate's decision. There are two issues before the Court:

(1) whether the evidence presented before the Magistrate Judge was sufficient to support his finding of probable cause, and (2) whether the Magistrate Judge properly interpreted the political offense exception to the Extradition Treaty when he concluded that Ordinola's actions were not political offenses.

The Court grants Mr. Ordinola's Petition for Writ of Habeas Corpus and denies Peru's request for extradition because although there is sufficient probable cause to support the alleged offenses, the Court concludes that Ordinola's actions in the Colina Group fighting "The Shining Path," a violent terrorist organization fall within the purview of the political offense exception under the Extradition Treaty in force between the United States and Peru. While the nature of Ordinola's actions were violent and provocative, his actions were sanctioned Peruvian government tactics at the time to root out a dangerous terrorist organization and these acts squarely fall within the political offense exception to extradition.

## I.  BACKGROUND

Petitioner Wilmer Yarleque Ordinola served in the Peruvian army for over twenty years.  (Order Granting Government's Compl. Seeking Extradition Wilmer Yarleque Ordinola at 1-2 [hereinafter "Order"].)  Toward the end of his career in the army, he assumed a position in military intelligence as a member of the Colina Group.  (*Id.*)  The president at the time, Alberto Fujimoro, created the special force in an effort to fight the war on

2

terrorism.   (Mem. Supp. Pet. Writ Habeas Corpus at 7 [hereinafter "Habeas Petition"].)   Fujimoro created the Colina Group to combat terrorism in Peru, specifically targeting a guerrilla group known as the "Shining Path."   (*Id.*)   The Shining Path, founded by Abimael Guzman, sought to destroy the Peruvian institutions through exceptionally violent means in order to replace them with a peasant revolutionary regime.   (Order at 16.)   The Shining Path targeted every institution in Peru including government officials, election workers, tourists, priests and nuns, teachers, journalists, and political activists.   (*Id.*)   Although the Shining Path sought to overthrow the Peruvian government, their danger cannot be diminished in light of this ultimate goal because the Shining Path aimed their destruction against the entire state, brutally murdering several innocent civilians and calling for a state of national emergency.   (*Id.*)

Even the United States has recognized the violent tactics the Shining Path has so emphatically embraced.[1]   It has been

---

[1] Since the capture of Abimael Guzman, the Shining Path's threat over Peru has substantially diminished.  However, as of October 11, 2005, the Secretary of State continues to designate the Shining Path as one of forty-two (42) Foreign Terrorist Organizations ("FTO") pursuant to section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.  UNITED STATES DEPARTMENT OF STATE, OFFICE OF COUNTERTERRORISM, FOREIGN TERRORIST ORGANIZATIONS FACT SHEET (2005), http://www.state.gov/s/ct/rls/fs/37191.htm (last visited Nov. 15, 2005).  Under section 219, the Secretary may designate an organization as an FTO if it is 1) a foreign organization that, 2) engages in terrorist activity or terrorism or bears the ability and intent to engage in terrorist activity or terrorism and thereby, 3) threatens the national security of the United States or its people.  8 U.S.C. § 1189.

described as an insurgency that ranks "high in the pantheon of history's real and fictional monsters." *The Threat of the Shining Path to Democracy in Peru: Hearing Before the Subcomm. on Western Hemisphere Affairs of the H. Comm. on Foreign Affairs*, 102nd Cong. 4-6 (1992) [hereinafter *Threat of the Shining Path*] (statement of Cal. Robert J. Lagomarsino, Member, H. Subcomm. on Western Hemisphere Affairs). One professor has even categorized it as "the most brutal, vindictive, and elusive terrorist insurgency in the Western Hemisphere." *Id.* at 42 (statement of Gabriela Tarazona-Sevillano, Visiting Professor of International Studies, Davidson College). In seeking to overthrow Peru's democracy, the Shining Path relied on terrorism to cause fear amongst the Peruvian population by brutally torturing and murdering several innocent civilians. *Id.* at 29 (statement of Alexander Wilde, Executive Director, Washington Office on Latin America). The insurgency generated fear through extreme and grotesque violence. Shining Path members cut tongues from adults and force-fed the tongues to the children of the victims. *Id.* at 6 (statement of Cal. Robert J. Lagomarsino, Member, H. Subcomm. on Western Hemisphere Affairs). Further, those civilians attempting escape or refusing to cooperate would endure a publicly humiliating demise as they were stripped and tied to a post as Shining Path members forced adults and children from the community to cut pieces of flesh from the victim who would eventually suffer a slow and agonizing death. *Id.* at 7. Between

4

1980 and 1991, the Shining Path murdered almost 15,000 people. *Id.* at 4. Commentators went as far as to suggest that a successful defeat by the Shining Path may have invoked genocidal consequences. *Id.* at 53 (statement of Mich. Robert G. Torricelli, Jr., Chairman, H. Subcomm. on Western Hemisphere Affairs).

During Mr. Ordinola's service with the Colina Group, he allegedly participated in four violent incidents that are at issue in this case. First, on November 3, 1991, Mr. Ordinola and other members of the Colina Group acted upon intelligence information that members of the Shining Path were engaging in a fund raising party. (Habeas Petition at 8.) Mr. Ordinola and other agents allegedly opened fire at the crowd, killing fifteen people and seriously injuring four. (Order at 7.) The Peruvian government charges Mr. Ordinola with aggravated homicide, inflicting major intentional injuries, and delinquent association arising from this incident. (*Id.*)

Second, in the Hugo Muñoz Sanchez incident, on July 17, 1992, Mr. Ordinola and the Colina Group allegedly entered La Universidad Nacional de Educacion ("La Cantuta University) and gathered a total of fifty (50) students. (Order at 8.) A Colina Group agent identified nine (9) students and one (1) professor as having terrorist connections and the Group allegedly murdered these individuals. (*Id.* at 9.) The Peruvian government charges Mr. Ordinola with aggravated homicide, aggravated kidnapping, and

forced disappearance in association with this incident.  (*Id.*)

Third, on June 23, 1992, agents from the Colina Group allegedly followed directions to kidnap Pedro Yauri Bustamante, a radio station host.  (Order at 10.)  Agents interrogated Mr. Bustamante who allegedly maintained terrorist connections.  (*Id.*) After refusing to respond to the agents' inquiries, Mr. Bustamante was fatally shot in the head.  (*Id.* at 10-11.)  The Peruvian government charges Mr. Ordinola with aggravated kidnapping and aggravated homicide associated with this incident. (*Id.* at 9.)

Fourth, on May 1, 1992, the Colina Group allegedly kidnapped and murdered nine cotton mill workers who allegedly complained about their working conditions.  (Order at 11.)  The Peruvian government charges Mr. Ordinola with aggravated kidnapping and aggravated homicide pertaining to this incident.  (*Id.*)

In September of 1992, the Peruvian military captured leaders of the Shining Path including its founder Abimael Guzman. (Habeas Petition at 9.)  President Fujimori assumed another term for presidency in 1995.  (*Id.*)  While Fujimori was President, Peruvian officials never charged Mr. Ordinola for any crimes arising from the four incidents.  (*Id.*)  President Fujimori was succeeded by Alejandro Toledo.  (*Id.*)  The Toledo government began arresting agents of the Colina Group in 2000, and have since detained them under brutal conditions without trial.  (*Id.* at 10.)  The Toledo government has sought the extradition of

Fujimori himself but Japan denied extraditing the former
President of Peru.  (*Id.*)

Mr. Ordinola arrived in the United States on February 20,
2001.  (Order at 3.)  On June 22, 2001, he filed for political
asylum.  (*Id.*)  On November 12, 2003, the Embassy of Peru asked
the United States to obtain arrest warrants for purposes of
extraditing Mr. Ordinola.  (*Id.*)  David Buentello, Consul of the
United States at the United States Embassy in Peru, certified by
oath, documents from the Peruvian government concerning the
extradition of Mr. Ordinola.  (*Id.* at 4.)  United States
Magistrate Judge Liam O'Grady issued an arrest warrant for Mr.
Ordinola and after conducting an extradition hearing, the
Magistrate Judge issued a Certificate of Extraditability on June
10, 2005.

Magistrate Judge O'Grady concluded that "sufficient probable
cause that Defendant committed each of these offenses exists to
reach the evidentiary standard required for extradition for all
charges."  (Order at 12.)  Additionally, the Magistrate Judge
held that the terms of the Treaty covered the charged offenses
and were extraditable because they did not fall within the
parameters of the Treaty's political offense exception.  (*Id.* at
15.)  The Court agrees with the Magistrate Judge that sufficient
probable cause existed but reverses the Magistrate Judge's
findings that Mr. Ordinola's actions are not extraditable because
the Court holds that they fall within the purview of the

7

political offense exception.

## A.   Habeas Corpus Standard of Review

An individual subject to extradition by a Magistrate Judge's Order does not enjoy the right to directly appeal that decision. *Collins v. Miller*, 252 U.S. 364, 369-70 (1920).  A writ of habeas corpus is the only available means in which the individual may seek review of the Magistrate Judge's extradition decision.  *Id.* However, the reviewing judge is subject to substantial restrictions in extradition cases and habeas review is limited to three inquiries: "[1] whether the magistrate judge had jurisdiction, [2] whether the offence [sic] charged is within the treaty and...[3] whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Courts generally grant habeas review to measure whether there is sufficient probable cause supporting the alleged offenses, or to decide whether an offense is non-extraditable because it falls under the political offense exception of the Treaty.  *See e.g.*, *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (concluding that "the political offense question is reviewable on habeas corpus as part of the question of whether the offense charged is within the treaty."); *Eain v. Wilkes*, 641 F.2d 504, 520 (7th Cir. 1981) (analyzing upon review, evidence introduced to support probable cause, and disturbances that are of a political character).

8

**B.   Magistrate Judge's Determination of Extradition Standard of Review**

The Court will apply the clearly erroneous standard in evaluating a petitioner's challenge to the Magistrate Judge's probable cause determination and review of the extradition warrant. *Garcia-Guillern v. United States*, 450 F.2d 1189, 1192-93 (5th Cir. 1971). The Court will uphold a Magistrate Judge's decision if "there is any competent evidence in the record to support it." *Quinn*, 783 F.2d at 791; *see also Fernandez*, 268 U.S. at 312 (clarifying that the evidence does not need to amount to that necessary to convict). Evidence is generally competent in extradition cases if it is properly authenticated. *Barapind v. Enomoto*, 360 F.3d 1061, 1069 (9th Cir. 2004). Federal law governing evidence for extradition proceedings specifies that "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that [the evidentiary documents are] authenticated in the manner required." 18 U.S.C. § 3190 (1948).

In considering whether to grant a habeas petition for the political offense question, the Court must review the Magistrate Judge's decision *de novo* because it constitutes a mixed question of fact and law. *Ahmad v. Wigen*, 726 F. Supp. 389, 408 (E.D.N.Y. 1989). The Extradition Treaty in force between the United States and Peru includes an exception for political offenses that states "[e]xtradition shall not be granted if the offense for which

9

extradition is requested constitutes a political offense."
Extradition Treaty Between the United States of America and the
Republic of Peru, U.S.-Peru, art. IV § 2, July 26, 2001, Treaty
No. 107-6 [hereinafter "Extradition Treaty"].  Under this
provision, an alleged offense or series of crimes may be non-
extraditable if they fall under the political offense exception.
An act is of a political character if there is a political
uprising and the offense is incidental to that political
disturbance.  *See e.g., Garcia-Guillern,* 450 F.2d at 1192
(holding that the political offense exception applies to those
acts which the fugitive commits in the course of a political
uprising).

## II.  DISCUSSION

The Court upholds the Magistrate Judge's finding that
sufficient probable cause exists to support the alleged offenses.
However, the Court reverses the Magistrate Judge's decision to
extradite Mr. Ordinola because Mr. Ordinola's actions survive the
political offense exception test.  Mr. Ordinola committed alleged
offenses during a political uprising and those acts were
incidental to that political uprising.  Thus, the acts are non-
extraditable under the purview of the political offense
exception.  Mr. Ordinola's actions are even sufficiently
political in nature in light of the narrower incidence test
adopted by some courts because his actions served to combat
terrorism.  Finally, not only do Mr. Ordinola's actions fit
squarely within the parameters of the political offense

10

exception, but none of the exemptions to the political offense exception in the Extradition Treaty apply to Mr. Ordinola.

## A.   Probable Cause Analysis

The Court denies the Petitioner's Writ of Habeas Corpus for the claim that the extradition documents fail to establish probable cause because the Magistrate Judge did not make any clear errors in his probable cause determination.  First, Mr. Ordinola asserts that because the Peruvian government's chief witness lacks credibility, the documented evidence fails to establish probable cause.  (Habeas Petition at 27.)  Second, Mr. Ordinola argues that the extradition documents fail to link him to the alleged criminal activity.  (Habeas Petition at 27.)  The consular of the United States may verify the competency of evidence by authenticating the documents submitted into evidence for the extradition proceeding.  18 U.S.C. § 3190.  The discretion of the Magistrate Judge evaluating the evidence is limited because the weight and sufficiency of this evidence is a question left for the court deciding the guilt or innocence of a defendant.  *Garcia-Guillern*, 450 F.2d at 1192-93; *see also Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962) (characterizing the extradition proceeding as a preliminary determination of whether there is evidence suggesting guilt to place the defendant on trial in a separate tribunal).  Because David Buentello, Consul of the United States at the United States Embassy in Peru, certified the documents by oath, the Court may

11

assume that the evidence is competent.  Because the Magistrate
Judge thoroughly analyzed these documents supporting Mr.
Ordinola's involvement in each of the four incidents and has not
made any clear erroneous errors (Order at 7-12), this Court must
affirm his probable cause determination.  Although Petitioner
argues that some documents are unreliable, indicating a lack of
probable cause, the Court finds that it is a question of weight,
and an inquiry left for a court to decide at trial.

## B.   Political Offense Exception Analysis

The Court grants the petitioner's Writ of Habeas Corpus for
the political offense exception claim because Mr. Ordinola's
alleged offenses arising out of the four alleged incidents are
non-extraditable offenses under the political offense exception
of the Extradition Treaty in force between the United States and
Peru.  This case involves allegations of crimes committed by a
former government actor.  While some courts argue that the
political offense exception does not extend to protect former
government actors, this court upholds the Magistrate Judge's
decision to apply the exception to former government actors.
(Order at 15 n.4.)  The court in *Suarez-Mason* argued against
adopting the exception for government officials because the
protection is meant to cover those rebellions against the
government.  694 F. Supp. 676, 704-05 (N.D. Cal. 1988).  It
argued that protecting individuals seeking to implement political

change in the current legal order would diminish the very essence and purpose of the exception. *Id.* The court added that the government should be held accountable for any illegal actions taken while under power. *Id.* If this Court chose to adopt the Suarez-Mason standard, this narrow construction would contravene the goals of several nations to combat terrorism. The facts at issue concern a political disturbance caused by the Shining Path, a terrorist organization. The political offense exception must apply to the government actors seeking to protect their legal order as opposed to protecting a terrorist organization's violent attempts to overthrow the government. *See Eain*, 641 F.2d at 520 (suggesting that the political offense exception is not so "absurd" as to invite terrorists to commit atrocious crimes in other nations and subsequently flee the country avoiding accountability for their acts while enjoying the privilege of the political offense exception). Accordingly, this Court applies the political offense exception to the facts before it and grants Mr. Ordinola's Writ of Habeas Corpus pursuant to the exception.

Article IV of the Extradition Treaty in force between Peru and the United States articulates the bases for denying extradition. Extradition Treaty, art. IV. One of the exceptions bars extradition for actions that constitute a political offense. *Id.* at art. IV § 2. Mr. Ordinola's alleged actions fall within the purview of this exception. Further, none of the exemption provisions to the political offense exception clause of the

Treaty preclude Mr. Ordinola from asserting its protection.

An act falls within the parameters of the political offense exception upon the fulfillment of the dual pronged incidence test.  First, the individual must have carried out the offense during a violent political uprising.  *Eain*, 641 F.2d at 516.  Second, the conduct must be incidental to the political disturbance.  *Id.*

### 1. *Political Uprising*

The Court holds that the Ordinola evidence fulfills the first prong of the incidence test because there was a political uprising in Peru at the time Mr. Ordinola committed the alleged offenses.  A political uprising may include "a political revolt, an insurrection, or a civil war."  *Ornelas v. Ruiz*, 161 U.S. 502, 511-12.  In accommodating to modern times, courts have extended the definition to include rebellions and revolutions.  *Eain*, 641 F.2d at 520-21.  The Peruvian government charges Mr. Ordinola with crimes that he allegedly committed between 1991 and 1992.  It is well documented that during this time period, the Peruvian government faced substantial terrorist threats.  The Shining Path undertook several violent means that amounted to a rebellion as they attempted to overthrow the government for the purpose of replacing it with a peasant revolutionary regime.  The Shining Path, known as one of the most dangerous insurgencies in history, brutally murdered and tortured government officials and several

14

other Peruvian institution supporters.  During this political
upheaval the Peruvian government declared a state of national
emergency.  The Court holds that the evidence fulfills the first
prong of the incidence test because the Shining Path's commission
of brutal crimes, and the Peruvian government's genuine concern
for the nation illustrate that the disturbance in Peru amounted
to a political uprising or rebellion.

### *2.  Incidental to a Political Uprising*

The Court holds that the evidence fulfills the second prong
of the incidence test because Mr. Ordinola's alleged commission
of offenses was incidental to the political uprising in Peru.
Conduct is incidental to a political uprising if there is a close
nexus or link between the offense and the political objective.
*Barapind*, 360 F.3d at 1075.  In deciding "whether a rational
nexus exists between the alleged crimes and the political
disturbance, the focus of inquiry is on the circumstances and the
status of those harmed and not merely on whether the acts were
committed during the disorder."  *In re Extradition of Demjanjuk*,
612 F. Supp. 544, 570 (N.D. Oh 1985).  During the political
insurgency, Fujimori was the President.  In an effort to suppress
the Shining Path, he created the Colina Group.  The Colina Group
acted on behalf of the Peruvian government to combat terrorism.
Mr. Ordinola, as an agent of the Colina Group allegedly committed
violent acts against alleged Shining Path associated individuals

and these acts bear a rational nexus to the political disturbance because the Colina Group acted upon information that the individuals were part of the terrorist organization violently seeking to overthrow the government and causing the political uprising in the nation.  Mr. Ordinola did not coincidentally take action against the alleged "victims" during the political upheaval.  Instead, he committed the alleged crimes with "regard for the political affiliations...of the victims." *Demjanjuk*, 612 F. Supp. at 570.  Because Mr. Ordinola committed the alleged offenses on behalf of the Colina Group and in response to a political insurgency, his acts were sufficiently incidental to the political uprising.

### *3. Narrow Political Offense Exception Analysis*

The Court holds that the Mr. Ordinola's actions survive scrutiny under a narrower incidence test that considers the civilian status of victims because the Peruvian government led Mr. Ordinola to believe that the alleged victims bore some association to the Shining Path.

In the Supreme Court's analysis of the political offense exception, it supplied a list of factors to consider, including, "the character of the foray, the mode of attack, the persons killed or captured, and the kind of property taken or destroyed." *Ornelas,* 161 U.S. at 511-12.  While at least one court construes these given set of factors liberally, others have used them to restrict the boundaries of the incidence test.  *Compare Quinn,*

16

783 F.2d 776, 801 (noting that a proper application of the incidence test without an inquiry as to the status of the victims, suffices to fulfill the objectives of the political offense exception), *with Eain*, 641 F.2d at 521 (extending the political offense exception inquiry to include a consideration of whether the act involved an indiscriminate attack on an innocent civilian population), *and In re Doherty*, 599 F. Supp. 270, 274 (S.D.N.Y. 1984) (finding that an act loses its political character if it involves an attack upon innocent civilians).  The *Eain* court adopted a narrower interpretation of the political offense exception to address modern international terrorism.  641 F.2d at 519-20.  The court held that considering the "degree or type of violent disturbance" would prevent an influx of terrorist fugitives from seeking protection under the political offense exception.  *Id.*  Under the narrow standard, the political offense exception does not extend to "isolated acts of social violence" such as attacks against innocent civilians.  *Id.*  Mr. Ordinola acted under the Peruvian government's Colina Group to defeat a terrorist regime causing the political uprising.  His actions were taken in response to government reports indicating that the alleged victims maintained connections with the Shining Path terrorist organization.  Although some of the attacks against the insurgents may have resulted in the murders of innocent civilians, Mr. Ordinola is not precluded from asserting the protections of the political offense exception because that

17

knowledge regarding the innocence of the civilians was unknown at the time of the attacks. *See* Michael S. Radu, Ph.D.[2] Aff. ¶ 13, Jan. 31, 2005 (stating that the entire Peruvian state was living in permanent violence as Shining Path members infiltrated *all* sectors of society).  To support the theory that the Colina Group's mission resulted in the murder of innocent civilians, the government focuses on certain facts such as the shooting of a little boy running to save his father and the alleged facts that a property owner directed the agents to murder his employees in retaliation for their demands for better working conditions. (Resp. Opp'n Pet. Writ Habeas Corpus 12-13.)  These allegations bear little significance when considering the nature of the threat imposed by the Shining Path.  For example, the fact that the little boy was a child is irrelevant when several of the Shining Path members themselves barely reached adolescence before participating in the insurgency's violent and brutal tactics.[3]

---

[2] Dr. Radu is the Senior Fellow and Co-Chairman of the Center on Terrorism, Counterterrorism and Homeland Security at the Foreign Policy Research Institute in Philadelphia, Pennsylvania.

[3] It was not uncommon for children or young teenagers to assume the terrorist roles of the Shining Path.  *Threat of the Shining Path* at 6 (statement of Cal. Robert J. Lagomarsino, Member, H. Subcomm. on Western Hemisphere Affairs).  In one incident, Shining Path members intercepted a bus and chose two French tourists to brutally murder.  *Id.*  The member that shot the couple was allegedly the only member over sixteen out of the insurgency group.  *Id.*  Because the French male did not immediately die from the bullet, a young male around the age of thirteen approached the victim and repeatedly struck the French tourist with a boulder, ultimately crushing the victim's skull. *Id.*

Furthermore, this Court does not find the need to divulge into the details of the status of each and every citizen murdered because to do so would intrude upon the internal affairs of Peru. *See Quinn*, 783 F.2d at 801 n.24 (stating that one of the policies that underlie the political offense exception is "a commitment to non-intervention in the internal affairs of foreign countries."); *see also Ahmad*, 726 F. Supp. at 405 (noting that ascertaining the roles of various individuals involved in the internal conflicts can be a strenuous task leading to ambiguous conclusions). Additionally, an argument that Mr. Ordinola should be held liable for the murders of the innocent civilians that happened to be with the terrorist members would contravene the purpose courts such as *Eain*, sought in adopting a limited political offense exception.  The *Eain* court's goal limited the exception to prevent terrorists from committing atrocious crimes against innocent civilians and avoiding accountability for the crimes. 641 F.2d at 520.  Mr. Ordinola engaged in missions not as a terrorist seeking to destroy a civilian populace, but as a government official taking actions against terrorists threatening the lives of innocent civilians.  Because Mr. Ordinola did not knowingly murder innocent civilians, even a narrowly construed political offense exception protects his alleged offenses.

### *4.  Exemption Provisions of the Political Offense Exception*

The Court holds that Mr. Ordinola'a actions fall within the

parameters of the political offense exception not only because they survive under the incidence test, but because none of the exemptions to the political offense exception in the Treaty apply to Mr. Ordinola's case.  The Magistrate Judge erred when he concluded that Ordinola's actions violated the laws of armed conflict and he added terms to the Extradition Treaty and opined that Ordinola's "actions ...violate international standards of civilized conduct, including the indiscriminate use of violence against civilians, should not constitute a political offense." Magistrate Judge's Order at 18.

The Extradition Treaty does not refer to "the laws of armed conflict" or "international standards of civilized conduct". When the text of a treaty is clear, it is not within the power of the courts to insert amendments or to alter the treaty in any manner. *Chan v. Korean Air Lines*, 490 U.S. 122, 135 (1989).  The Extradition Treaty at issue includes an exception for political offenses.  Extradition Treaty art. IV § 2.  In addition, within the exception, there are three unambiguous limitations that are exempt from the political offense exception.  The limitation at issue exempts from the political offense exception

> "an offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution, including, but not limited to: (i) illicit drug trafficking and related offenses, as described in the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, done at Vienna on December 20, 1988; and (ii) offenses related to

terrorism, as set forth in multilateral international agreements to which both Contracting States are parties."

Extradition Treaty, art. IV § 2(c).

The Magistrate Judge and the government contend that the political offense exception fails to protect Mr. Ordinola from extradition because his acts violated the "laws of armed conflict" defined by Common Article 3 of the Geneva Conventions, a multilateral international agreement to which both the United States and Peru subscribe.  Geneva Convention Relative to the Treatment of Prisoners of War art. 3, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.  Upon a literal interpretation of the Treaty provisions, this argument fails.  The Extradition Treaty exempts offenses that are contained within a multilateral agreement, but imposes the additional limitation that the agreement includes an "obligation...to extradite the person sought or to submit the case to their competent authorities." Extradition Treaty art. IV § 2(c).  The Government fails to show that the United States and Peru have an obligation to extradite or submit to authorities, fugitives that are in violation of the laws of armed conflict pursuant to the Geneva Conventions. Because article 3 of the Geneva Conventions fails to fulfill the requirements for the limitations of the political offense exception, *see* Geneva Convention art. 3 (discussing the obligations of countries bound by the laws of armed conflict without mentioning extradition), and because the government fails to articulate violations of applicable multilateral agreements

21

that impose an obligation upon a nation to retire a fugitive, this Court holds that the political offense exception applies to Mr. Ordinola.

### IV.   CONCLUSION

This Court holds that the Magistrate Judge properly reviewed the evidence in making its probable cause determination. However, because Mr. Ordinola may not be extradited to Peru because Mr. Ordinola's actions as a member of the Colina Group were incidental to a political uprising and thus his alleged offenses fall within the political offense exception against extradition.

It is hereby

ORDERED that Mr. Ordinola's Petition for Writ of Habeas Corpus is GRANTED.  The writ shall issue forthwith and the United States is ORDERED to release Mr. Ordinola from custody.

The Clerk is directed to issue the writ and to forward a copy of this Order to counsel of record.

ENTERED this _21st_ day of November, 2005.



       /s/
                            Gerald Bruce Lee
                            United States District Judge

Alexandria, Virginia
11/ 21 /05